STATE v. WILLIAMS.

No. 2939.   Decided March 21, 1917.   (164 Pac. 253.)

1. CRIMINAL LAW—NEW TRIAL—ABUSE OF DISCRETION.  Where the evidence barely sustained a conviction for larceny of horses, the trial court abused its discretion in denying a new trial motion, largely based on cumulative affidavits, showing there was nothing suspicious in accused's connection with the horses, and that the man from whom he had innocently secured them really existed, which the sheriff had testified was not a fact. (Page 337.)

2. CRIMINAL LAW—NEW TRIAL—DILIGENCE IN PREPARING FOR TRIAL. Evidence *held* to establish that accused was reasonably diligent in preparing for trial after his release on bail after seven months' confinement, where he was without funds, and important witnesses lived several hundred miles distant, and subpoenas were given the sheriff to serve them, but they did not appear.[1]   (Page 337.)

Appeal from District Court, Fifth District; *Hon. Joshua Greenwood,* Judge.

L. A. Williams was convicted of grand larceny. He appeals.

REVERSED and remanded, with directions.

*Wm. B. Higgins, J. S. Giles,* and *S. A. King,* for appellant.

*Dan B. Shields,* Atty. Gen., and *Jas. H. Wolfe* and *O. C. Dalby,* Asst. Attys. Gen., for the State.

McCARTY, J.

The defendant was tried and convicted in the district court of Millard county, Utah, for the crime of grand larceny. The larceny alleged consisted of the theft of two horses, the property of one John Terry. The evidence shows that the animals described in the information were stolen from the Terry ranch situated near the town of Hinckley, in Millard county,

---

[1]*State* v. *Pótello,* 40 Utah 56, 119 Pac. 1023.

on or about the 25th day of March, 1915. The defendant does not question the sufficiency of the evidence to establish the larceny, but contends that it is insufficient to support the finding of the jury that he is the guilty party. The grounds relied on for a reversal of the judgment are: (1) The insufficiency of the evidence to support the verdict; and (2) the overruling of defendant's motion for a new trial.

The facts, in substance, are as follows: The defendant, a resident of Saw Mill Canyon, White Pine County, Nev., was sent from Ely, Nev., by a man by the name of 1,2 W. R. James, to Fillmore, Millard County, Utah, to get three horses and a saddle belonging to James, and which were in the custody of Sheriff D. S. Dorrity at Fillmore. Defendant came by rail via Salt Lake City to Millard County. He received the horses and saddle from Sheriff Dorrity at Fillmore, and started on his return trip to Ely, Nev. From Fillmore he went to the Terry ranch, situate near the town of Hinckley, in Millard County. He stayed over night, and the following day at the ranch with two acquaintances of his, James Campbell and James Carter. From Campbell he obtained a small grey, unbroke pony. He had never traveled overland between Hinckley, Utah, and Ely, Nev., and was unacquainted with the country between these places. The nearest point from Hinckley on the road or public highway between Hinckley and Ely, Nev., where forage for horses could be obtained is the Meechem ranch, a distance of eighty-five miles. This necessitated an eighty-five-mile ride after leaving the Terry ranch, before he could obtain hay for his horses. Because of this the defendant, so he testified, decided to leave the Terry ranch in the evening and travel the first half of the distance from Hinckley to the Meechem ranch at night. On this point, in response to interrogatories on cross-examination by the district attorney, he testified as follows:

"Q. Did you have any particular object in leaving there at night and not in the daytime? A. It was eighty-five miles from Hinckley to the Meechem ranch. I didn't know the country, but I could see into the Antelope Pass. * * * I rode away in the night because if I lost the road I could

find the way to Antelope Pass. I could see where the pass was and could see it at night, and I wanted daylight for the after part of the ride.''

No effort was made by the state to dispute or to weaken defendant's testimony regarding the topography and the physical condition of the country through which the road extends from Hinckley to the Meechem ranch. In fact, there does not seem to be any controversy regarding defendant's movements and the conditions under which he traveled from Fillmore with the horses he received from Sheriff Dorrity to his home in Nevada.

Defendant's version of the circumstances under which he came into possession of the horses described in the information and the disposition he made of them on reaching Nevada is about as follows: At about two o'clock on the day after he came to the Terry ranch with the James horses he was in front of a store in the town of Hinckley, and a man rode up on horseback and inquired of him if he ''was the fellow that was going to Ely horseback,'' and that he answered in the affirmative. The man, who gave his name as Bidwell, stated that he had a couple of gentle horses that he desired to send ''over to the Ely country''; that he could not take them himself because he ''was going to Salt Lake two or three days on business.'' The defendant, in consideration that he would be permitted to ride one horse and use the other for a pack animal on the trip, agreed to take the horses and leave them at Water Canyon, which is between Ely and Saw Mill Canyon, and where Bidwell claimed the horses were raised. The defendant informed Bidwell that owing to the fact that he had an eighty-five-mile ride to make before coming to the next ranch or stopping place he intended to leave at night, and suggested to Bidwell that he bring the horses to the Terry ranch. Bidwell stated that he was in the horse business, and was then camping a few miles west from the Terry ranch and near the main traveled road along which defendant would travel to Ely; that he would have the horses ready for defendant when he arrived opposite the camp, provided he (Bidwell) should be unable to take them to the Terry ranch before defendant left for Ely. Pursuant to this un-

derstanding defendant received the horses from Bidwell on the road near the camp at 10 o'clock p. m. that night, and proceeded on his journey. He took approximately a direct course for Antelope Pass following the main traveled road for twelve or fifteen miles of the distance. In the afternoon of the following day he arrived with the horses, six in number, at what is known as Antelope Springs. There he met and conversed with several men with a sheep camp outfit who were camped near the springs. That same evening, "between sundown and dusk," he arrived at the Meechem ranch. E. W. Meechem, the owner of the ranch, furnished him lodging, stabled and fed his six horses overnight. While he was at the ranch the defendant and Meechem briefly discussed the James horses, and casually mentioned the other three horses defendant had with him. From the Meechem ranch defendant traveled along the public road or highway to Ely, where he remained overnight, putting up the horses at a public corral or feed yard. The next morning he resumed his journey homeward, traveling along the public traveled road. When he arrived at Water Canyon he turned the horses which he claimed to have received from Bidwell loose on the public domain.

The foregoing is, in substance, defendant's evidence respecting his movements and what he did from the time he came to the Terry ranch with the James horses until he turned the stolen horses loose on the public domain at Water Canyon. About three days after he arrived home he was arrested on a telegram from the sheriff of Millard County and was taken by the officer, a deputy sheriff of White Pine County, in an automobile to Ely. Defendant and his wife, the latter being present when the arrest was made, testified that defendant was not advised by the officer making the arrest of the nature of the charge against him. The deputy sheriff making the arrest, however, testified that he handed defendant the telegram when the arrest was made, and informed him that the charge was grand larceny. The significance of this conflict in the evidence on an apparently immaterial matter will appear farther along in this opinion.

Defendant, as he passed Water Canyon in custody of the

officer, directed the officers' attention to two horses that were grazing on the public domain some distance from the road that resembled, and probably were, the stolen horses in question. The deputy sheriff testified that Water Canyon is a place "where they generally have drives"; that he has "always understood they have a trap there, and it is a place where they hold horses—where different horse gatherers trap and hold their horses." On being questioned by the officer the following day regarding the horses he was accused of stealing, the defendant stated that they were turned over to him at Hinckley, Utah, by a man by the name of Bidwell, who instructed him to take them to Water Canyon, White Pine County, Nev., and there turn them loose on the public domain. His statement to the officer in that regard was substantially the same as that made later by him at the trial. A few days after the arrest the horses were found at Water Canyon in the vicinity of where the defendant claimed he had left them.

C. W. Meechem was called by the state and testified that when the defendant stopped at his ranch with the horses he had a conversation with him in which defendant, after speaking of the James horses, "turned to these three and said, 'Those three belong to me;' that is, these two horses [the Terry horses] and a little white pony that he had." On cross-examination the witness qualified this remark by saying, "As near as I can recall it that is the statement that he made." This is the only direct incriminating evidence against defendant in the record.

The theory on which the case was prosecuted in the trial court was that the stolen horses were not delivered to defendant by Bidwell, or by any other person, at or near the Terry ranch, or elsewhere. And that is the theory advanced by the state in this court. Mazzie Williams, the defendants' wife, testified that she had recently heard of a man in White Pine County, Nev., known as Jack Bidwell; that she heard a Mrs. Gregor who "kept boarders in Ely" speak of him; that this lady is known in Ely as "Mrs. Gregory of Ely." D. Blanchard, defendant's father-in-law, also testified that he knew of, but had never met, a man in White Pine County, Nev., by the

name of J. P. Bidwell, giving the names of several parties whom he claimed he had heard speak of Bidwell. One of those parties was a Mr. Lowe, whose affidavit defendant later filed in support of the motion for a new trial. This affidavit, and similar affidavits made by other parties that were filed by the defendant in support of his motion for a new trial, will be referred to later.

The deputy sheriff of White Pine County, who arrested the defendant on the telegram referred to, testified that he did not know and had never heard of a man in White Pine County by the name of Bidwell.

The defendant's course of conduct, what he did and what he said from the time he claims to have received the stolen horses from Bidwell until he was returned to Utah in custody of the officer to stand trial for the larceny is, with the exception of his alleged statement to Meechem herein referred to, as consistent with the theory of innocence as it is with the theory of his guilt. In fact, much of it is somewhat inconsistent with the theory of guilt. The fact that he proceeded along the public highway without any attempt at concealment or to avoid meeting with people residing near, and those travelling along, the road, and finally turned the stolen horses loose on the public domain, etc., at a place used as a rendezvous by "horse gatherers" and where horses are "trapped" and corralled, is more consistent with his innocence than it is with the theory of guilt.

Comp. Laws 1907, section 4355, provides that "possession of property recently stolen, when the party in possession fails to make a satisfactory explanation, shall be deemed prima facie evidence of guilt." The jury evidently did not regard defendant's explanation of how he came into possession of the property as satisfactory. In view that the deputy sheriff testified that he had never seen or heard of a man by the name of Bidwell in White Pine County, Nev., or elsewhere, the jury no doubt regarded the evidence of Mrs. Williams, defendant's wife, and that given by Blanchard, his father-in-law, respecting the existence and whereabouts of Bidwell, as weak and unsatisfactory. Moreover, the evidence of the defendant and his wife, wherein they stated that the deputy

sheriff, when he arrested defendant, did not inform him of the nature of the crime with which he was charged, was flatly contradicted by the deputy sheriff. This, as a legal proposition, was unimportant, except that it tended to, and no doubt did, affect the veracity of defendant and his wife before the jury.

Referring to the affidavits filed by the defendant in support of his motion for a new trial, counsel for the state, in their printed brief, say:

"Some seventeen affidavits were filed on behalf of appellant, chiefly directed to the point of establishing the identity of the man named Bidwell from whom the appellant testified he received the horses near Hinckley, Millard County, Utah. The affidavits are cumulative, and the record does not show sufficient diligence on the part of appellant to warrant the court to grant the motion."

The record shows that the defendant was, immediately after he was arrested (April 1, 1915), taken to Millard County, Utah, and, being unable to furnish bail, he was confined in jail until after he was tried and convicted. On November 10, 1915, more than seven months after he was arrested, he secured and was released on bail. He was without means and unable to employ counsel to defend him. He was, during the time he was in jail awaiting trial, more than 200 miles by wagon road from his home, relatives, friends, and acquaintances, all of whom resided in the state of Nevada, and out of the jurisdiction of the court. Under such circumstances the defendant should not be held to the same degree of promptness in preparing for trial, and to the same standard of diligence in procuring the attendance of witnesses, as is ordinarily required of defendants in criminal cases. Furthermore, the parties making the affidavits resided in another state out of the jurisdiction of the court, and more than 200 miles by wagon road from the place of trial. Defendant, in his affidavit filed in support of his motion for a new trial, recites that, immediately after he was released from jail on November 10, 1915, he went to White Pine County, Nev., and met and conversed with each of the parties who subscribed to the affidavits mentioned, and that they, and each

of them, expressed a willingness to either permit their depositions to be taken or come to this state in response to a subpoena and testify for and on behalf of defendant with reference to their knowledge of the existence of Bidwell and as to when and where they last saw him, and the business he was engaged in, and that they can and will fully describe him.

Counsel who represented defendant in the trial court made and subscribed to an affidavit, wherein he says that prior to the time of the trial he talked with defendant and defendant's wife about the witnesses necessary for defendant's defense as far as they knew, and that he had subpoenas issued for five witnesses, naming them. Two of these witnesses were James Campbell and James Carter, presumably the two men with whom defendant stayed over night and one day at the Terry ranch while on his return trip to Nevada with the James horses; that said subpoenas were placed in the hands of D. S. Dorrity, sheriff of Millard County, for service; that he does not know whether said witnesses were served or not; that none of the witnesses appeared at the trial, and defendant was compelled to go to trial without them.

While it is true that neither the affidavit of the defendant nor that made by his counsel recites the facts which defendant expects to establish with the evidence of Campbell and Carter, we think the only inference deducible from the record is that those parties are important witnesses. The evidence shows that at the time the larceny was committed those men were staying at the Terry ranch, the place where it is conceded the crime was committed. The defendant testified that when he was on his way to Fillmore to get the James horses he stopped with those men two days at the ranch, and he recites in his affidavit that Campbell accompanied him to Fillmore on that occasion and returned with him to the ranch. The evidence is also undisputed that Campbell and Carter were at the ranch when he left there for Ely, and that they furnished him with provisions and bedding with which to make the journey. It also clearly appears from the affidavits of defendant and his wife, and the testimony given by them at the trial, that neither of them had any information what-

ever before the trial that the parties making the affidavits, except three of the five persons for whom subpoenas were issued, and who did not appear at the trial, knew or claimed to know of a man by the name of Bidwell in White Pine County, Nev., or elsewhere. No attempt was made by the state to deny or refute the contents of the affidavits of the defendant and his wife respecting the diligence used by defendant in procuring the attendance of his witnesses and in preparing for trial.

We are of the opinion that defendant, under the circumstances, exercised all the diligence to procure the attendance of his witnesses and to prepare for trial that the law exacts.

The matters set forth in the numerous affidavits are mainly cumulative, and tend to show that there was nothing clandestine in the way defendant traveled with the stolen horses from the Terry ranch to Water Canyon; that he, on several occasions, stated that the horses belonged to a man by the name of Bidwell; that several of the parties making the affidavits claimed to be acquainted with Bidwell; that Bidwell, from the fall of 1906 to and including April, 1915, had, on numerous occasions, been in White Pine County, Nev. The description given of Bidwell in the affidavits corresponds substantially with the description given of him by defendant at the trial.

C. S. Crain, sheriff of White Pine County, Nev., subscribed to an affidavit in which he says that the deputy sheriff arrested defendant and took him to Ely on a telegram received at his office from Sheriff Dorrity of Millard County, Utah; that the telegram did not mention the crime for which the defendant was wanted by Millard County officers, and that neither he nor the deputy sheriff who arrested defendant was advised of the nature of the charge until after the defendant was taken to Ely; that after the defendant arrived at the sheriff's office he inquired of the sheriff the nature of the charge against him, and the sheriff answered that he did not know. On first impression it would seem that the affidavit of the sheriff on this point is wholly irrelevant, but in view that the deputy sheriff testified at the trial that he informed the defendant in the presence of his wife at the

time he arrested him of the nature of the charge against him, thereby flatly contradicting the testimony of the defendant and his wife on that point, the sheriff's affidavit is significant. At the trial the ·testimony of the existence of Bidwell was given only by the defendant, his wife and the defendant's father-in-law, and the jury may have given, and probably did give, considerable weight to the fact that the defendant was impeached by the deputy sheriff on what it, the jury, may have considered an important point in the case; and may have viewed wtih suspicion the circumstance of the defendant pointing out what appeared to be the stolen horses grazing on the public domain, as he and the sheriff passed Water Canyon, as a self-serving declaration on the part of the defendant.

One counter affidavit only was produced by the state, and it was filed for the purpose of impeachment. It affected only the weight of an affidavit made by a Mr. Young who claimed to have known a man in White Pine County, Nev., by the name of Bidwell. The Attorney General, in his printed brief, says: ''The record does not present as strong a case as could be desired where a person is condemned to imprisonment.'' Where, as here, the record made in the trial court presents a case wherein the evidence of guilt is admittedly weak and barely sufficient to support the verdict, the fact that the newly discovered evidence is largely cumulative ought not to control the discretion of the trial court in passing on a motion for a new trial, especially where, as in the case at bar, the newly discovered evidence, because of obstacles over which the defendant had no control, was not obtainable at the time of trial and much of which was then unknown to defendant and his counsel and which, if produced, might, and probably would, change the result if a new trial were had.

The facts of this case are, in some respects, somewhat similar to the facts of *State* v. *Potello,* 40 Utah 56, 119 Pac. 1023, to which case we invite attention. We are of the opinion that the trial court, in view of the peculiar facts and circumstances of this case, abused its discretion in overruling defendant's motion for a new trial.

The case is therefore reversed, and the cause is remanded

to the district court of Millard County, with directions to that court to set aside the judgment of conviction, and to grant a new trial.

FRICK, C. J., and CORFMAN, J., concur.